UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CASE NO.:

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

ERIC ZHU,

    Defendant.
_____/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

**I.
SUMMARY**

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

1. From approximately June 2021 through at least September 2021, Defendant Eric Zhu engaged in a fraudulent scheme to deceive investors in the "Game Coin" token ("GME"), a crypto asset that was offered and sold as a security, predominantly to investors residing in or around Baton Rouge, Louisiana.

2. Individual 1 and Individual 2, who are both in the landscaping business by trade, formed a business to develop a website-based "Game Coin" marketplace that would allow amateur athletes to create and sell digital trading cards of themselves. Individual 1 and Individual 2 contemplated the creation of a new crypto asset called "GME" that would serve as the medium of exchange for purchases of digital trading cards available for sale on the marketplace. Individual 1 and Individual 2 aggressively promoted GME on social media and promised investors that they would build a marketplace where investors could use GME to buy

digital trading cards of amateur athletes. Zhu, an experienced blockchain engineer, was hired to perform coding work for the offer and sale of GME to the public.

3.  From at least June 2021 through at least November 2021, Individual 1 and Individual 2 offered and sold GME to investors through a crypto asset trading platform known as PancakeSwap. PancakeSwap enables investors to trade crypto assets. PancakeSwap does so by facilitating the creation and operation of so-called "liquidity pools," which are pools of crypto asset pairs that may be exchanged for one another. For example, a liquidity pool may hold Crypto Asset A and Crypto Asset B, and an investor may withdraw Crypto Asset A from the pool in exchange for depositing Crypto Asset B into the pool.

4.  In June 2021, Individual 1 and Individual 2 launched the public sale of GME by establishing a PancakeSwap liquidity pool (the "GME Liquidity Pool" or the "Pool"). The GME Liquidity Pool enables any investor to buy and sell GME. As the name suggests, liquidity pools require liquidity (i.e., deposited crypto asset pairs available for trading). Individual 1 and Individual 2 arranged for GME and the crypto asset known as Binance Coin "BNB"[1] to be deposited into the GME Liquidity Pool. These deposits of GME and BNB served as the initial liquidity for the GME Liquidity Pool.

5.  Investors are able to interact with the GME Liquidity Pool – for example, buying GME and depositing BNB, or selling GME and withdrawing BNB. At any given time, the value of GME in the GME Liquidity Pool is determined by the ratio of GME and BNB in the Pool. As

---

[1] Generally speaking, PancakeSwap supports trading in a specific subset of crypto assets called "BEP-20 tokens." BNB itself is not a BEP-20 token, and therefore, investors generally cannot use BNB to buy and sell crypto assets through PancakeSwap. The applicable crypto asset pair in the GME Liquidity Pool is GME and "wBNB," which is a PancakeSwap-compatible crypto asset that is similar to BNB, but technologically distinct. For simplicity, we refer to wBNB as "BNB." Investors can acquire BNB through crypto asset trading platforms that support trading in BNB.

investors purchase GME through the GME Liquidity Pool using BNB, the supply of GME within the Pool decreases and the value of GME increases.

6. A person that deposits a crypto asset token pair (i.e., liquidity) into the Liquidity Pool receives "liquidity provider" tokens ("LP tokens"). Absent safeguards, these LP tokens allow the holder of the tokens to withdraw a pro rata share of the liquidity deposited into the Pool. Such liquidity pools create certain risks for investors, including the risk that the holder of a significant number of LP tokens will, without warning, withdraw a large portion of the token pair (here, GME and BNB) from the liquidity pool. The LP token holder may then sell (i.e., deposit) large volumes of one of the crypto assets into the Pool, thus significantly diminishing the value of that crypto asset. A significant withdrawal of liquidity, and corresponding sale of a crypto asset, is described by some in the crypto asset industry as a "rug pull" because the seller, in essence, pulls the rug out from under the investors who purchased crypto assets through the liquidity pool.

7. Cognizant of this risk, Individual 1 and Individual 2 represented in publicly-available social media posts that they implemented safeguards. In particular, they assured investors that "liquidity" was "locked," which in the parlance of the crypto asset industry, conveys that LP tokens cannot be used by the issuers or other insiders to withdraw liquidity in rug pull-like fashion.

8. Zhu engaged in a course of conduct that deceived GME investors about the vulnerability of the GME offering to rug pulls and about the value of GME. Zhu knew, or was reckless in not knowing, that investors were told that liquidity was locked. Zhu also knew, or was reckless in not knowing, that GME investors expected the creators of GME to take steps to safeguard LP tokens and prevent them from being used in a rug pull.

3

9. Yet, as part of the mechanics of the offer and sale of GME, certain LP tokens accrued to an address Zhu alone controlled. And, unbeknownst to anyone, including Individual 1 and Individual 2, Zhu kept those LP tokens *unlocked* and used them to withdraw GME and BNB from the Liquidity Pool. Zhu then sold the withdrawn GME into the Liquidity Pool and misappropriated crypto assets worth approximately $553,000. Zhu's sales were indicative of a possible rug pull and caused an approximate 12% decline in the price of GME.

10. Through his conduct, Zhu violated the antifraud provisions of the federal securities laws.

## II.
## VIOLATIONS

11. By engaging in the conduct set forth in this Complaint, Zhu violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

12. Unless enjoined, Defendant will continue to violate the federal securities laws. Among other relief, the Commission seeks a permanent injunction, disgorgement of ill-gotten gains with prejudgment interest, and a civil monetary penalty. The Commission further seeks any other relief that may be necessary and appropriate.

## III.
## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], and Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa(a)].

14.     The Court has personal jurisdiction over the Defendant and venue is proper in the Middle District of Louisiana because a substantial part of the events or omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in this District, including the marketing of the GME token and the purchases of GME by, and offers and sales to, investors.

15.     In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or the mails.

## IV.
## DEFENDANT AND OTHER RELEVANT ENTITY AND PERSONS

### A. Defendant

16.     **Zhu**, age 26, lives in New York, New York, and is a freelance blockchain engineer. Zhu was hired to provide technical assistance in connection with the offer and sale of GME to the public.

### B. Relevant Entity and Persons

17.     **Game Coin, LLC** is a Louisiana Limited Liability Company formed in August 2021, with its principal place of business in Baton Rouge, Louisiana. Individual 1 and Individual 2 formed Game Coin, LLC, for the purpose of offering and selling GME and developing a website-based marketplace that would allow amateur athletes to create digital trading cards.

18.     **Individual 1,** age 44, lives in Baton Rouge, Louisiana, and is the sole proprietor of a commercial and residential landscaping company.  Individual 1 funded the creation of the marketing website for GME and for the digital trading card marketplace and paid for the BNB that formed part of the initial liquidity for the GME Liquidity Pool.  Individual 1 also promoted the offer and sale of GME.

19.     **Individual 2**, age 42, lives in Denham Springs, Louisiana, and works primarily in the landscaping business and also serves as a youth baseball coach.  Individual 2 conceived of the digital trading card marketplace and the corresponding offer and sale of GME.  Individual 2 also promoted the offer and sale of GME.

20.     **Individual 3,** age 28, lives in Stirling, New Jersey, and at least as of May 2021, held himself out to Individual 1 and Individual 2 as having experience with the marketing and issuance of crypto assets.  He is also the Chief Executive Officer of a New Jersey corporation, which, among other things, purports to operate gas stations in New Jersey and New York.

## V. BACKGROUND ON CRYPTO ASSETS

**A.  Crypto Assets**

21.     The term "crypto asset" generally refers to an asset issued or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

22.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.

23. Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aim to achieve agreement on a data value or on the state of the ledger.

24. A public address is a unique string of numbers and letters that enables a crypto asset holder to send, receive and otherwise access their crypto assets. Each public address has a private key, which is analogous to a password and confers on the holder the ability to control the crypto assets stored at the public address.

25. Crypto asset trading platforms generally offer a variety of services relating to crypto assets, including trading services.

26. Certain crypto asset trading platforms, such as PancakeSwap–the platform where investors purchased and sold GME–enable trading in crypto assets by facilitating the creation and operation of liquidity pools, as alleged in this Complaint.

27. A "smart contract" is computer code deployed on a blockchain. For example, a smart contract may automatically assess a fee on transfers of particular crypto assets and deposit that fee into predetermined blockchain addresses. A smart contract can govern the issuance and distribution of tokens on a blockchain, and typically those who deploy such smart contracts can control them through administrative access rights.

**B. The Offer and Sale of Crypto Assets**

28. Crypto assets are often offered or sold by issuers or promoters, including, but not limited to, through so-called "initial exchange offerings," in which the initial distributions of the crypto asset by the issuer or promoter are effectuated through trading platforms.

29. The issuers or promoters offering or selling the crypto assets often publicly release a "whitepaper" or other marketing materials, which typically describe a project to which the asset relates, the terms of the offering, and rights associated with the asset.

30. Issuers frequently continue to sell the crypto assets after the initial offer and sale, including by, directly or indirectly, selling them on crypto asset trading platforms.

## VI.
## FACTUAL ALLEGATIONS

### A. GME and the "Game Coin" Digital Trading Card Marketplace

31. In April 2021, Individual 2 conceived the vision for a website-based digital marketplace that would enable amateur athletes to create and sell digital trading cards of themselves. Individual 2 conceived that athletes would use the proceeds of the sales to finance the costs associated with amateur sports, including sporting goods and travel to team events.

32. Individual 2 hoped to promote the marketplace, in part, by capitalizing on the popularity of crypto assets. He contemplated that the digital trading cards available for sale would only be purchased using a specific crypto asset, and not by using fiat currency, such as U.S. dollars, or other crypto assets. Individual 2 later named the crypto asset GME.

33. Based on his prior experience as a retail investor buying and selling crypto assets, Individual 2 believed that the best way to distribute GME to the investing public would be by selling GME to investors through an initial exchange offering on PancakeSwap.

34. In or around late April 2021, Individual 2 discussed his idea for the marketplace and for the GME crypto asset with Individual 1. Soon thereafter, Individual 1 agreed to finance marketing efforts to solicit GME investors and the development of the digital trading card marketplace, and to provide the initial liquidity for the GME Liquidity Pool.

35. Individual 2 contemplated a smart contract function that would assess a 10% fee on each GME transaction, including on GME purchases made through the GME Liquidity Pool and on GME transfers between investors. For example, if an investor purchased the equivalent of $100 in GME through PancakeSwap or transferred the equivalent of $100 in GME to another investor, the smart contract would automatically assess a fee equivalent to $10 in GME on the transaction.

36. Individual 2 further contemplated that the smart contract would have a function that automatically transfers the proceeds from the 10% fee in accordance with a preset formula: 4% to a crypto asset address earmarked for charity; 2% to a crypto asset address earmarked for marketing expenses; 2% distributed back to GME investors; and 2% for additional "liquidity" – i.e., for deposit into the GME Liquidity Pool.

### B. GME Marketing Efforts

37. From the time when GME was first available for sale on June 22, 2021, through at least November 2021, Individual 1 and Individual 2 aggressively marketed GME to solicit investors and increase the value of GME.

38. In or around June 30, 2021, Individual 1 and Individual 2 drafted and published the "Game Coin" whitepaper on their website, www.thegamecoin.net. The whitepaper explained that "[a]s an investor, you are investing into a vision of being able to provide every athlete in the world the opportunity to connect, compete and compare their abilities on one platform while at the same time being able to donate to a charity that will supply the less fortunate athletes the proper apparel, equipment and training tools necessary to succeed." The whitepaper described a "future platform/website that will be similar to Facebook, yet more dynamic and complex," that would track athlete statistics and have athlete rankings.

39. Individual 1 and Individual 2 promoted GME through social media and online chat rooms. For example, on August 11, 2021, Individual 1 posted in the "Game Coin" chat room on Telegram that "[i]f all of the Game Coin get bought, everyone in this community will never have to worry about 💰💵 ever again 💯"

40. Individual 1 and Individual 2 retained a local Baton Rouge advertising firm to assist with marketing GME. On August 17, 2021, Individual 1 represented to investors that the advertising firm would "launch a national digital marketing campaign" for GME that "will be to a targeted audience with a goal of reaching 1,000,000-5,000,000 clicks a month."

41. Individual 1 and Individual 2 also touted the safeguards intended to prevent rug pulls. On June 23, 2021, the "Game Coin" social media Telegram account posted the phrase "Liquidity Locked," and in so doing, conveyed that LP tokens were locked and could not be used by issuers or other insiders to perpetrate a rug pull.



42. That same day, Individual 2 posted the phrase "Liquidity Locked" on his Facebook account regarding the GME offer and sale.

10



43.     Starting in or around June 29, 2021, the "Game Coin" Instagram account page also touted "Liquidity Locked."



11

### C. The Minting of GME

44.     Notwithstanding these marketing efforts, neither Individual 1 nor Individual 2 had a background in technology.  Neither of them knew how to code a smart contract or build a website.  Accordingly, in advance of the GME offer and sale, Individual 1 and Individual 2 hired a third person, Individual 3, to assist with the public distribution of GME and the development of the marketing website for the digital trading card marketplace.

45.     In discussions with Individual 1 and Individual 2, Individual 3 held himself out as an expert in blockchain technology and coding, with a team of developers behind him.  Individual 3 agreed to help code the GME smart contract, arrange for the offer and sale of GME through PancakeSwap and build a marketing website for GME and the digital trading card marketplace, all in exchange for $15,000 and 3.5% of the future supply of GME.

46.     Despite his representations, Individual 3 also did not have the technical skills required to code a smart contract or conduct a crypto asset offer and sale through PancakeSwap.  Accordingly, Individual 3 contacted Zhu, who did have the requisite skills.  Zhu agreed to provide technical expertise in exchange for a promise of a percentage of the future supply of GME.  Individual 3 directed Zhu to code the smart contract, mint (i.e., create) GME tokens, and provide other technical assistance to establish the GME Liquidity Pool.

47.     Zhu did as he was instructed.  On or around June 22, 2021, Zhu coded the GME smart contract.  Consistent with Individual 2's contemplated design, Zhu included in the smart contract a function that assessed a 10% GME fee on each GME transaction.

48.     On or around the same day, Zhu minted 100 billion GME.  Of the 100 billion tokens, Zhu immediately destroyed (i.e., "burned") 25 billion, in accordance with instructions from Individual 1 and Individual 2.  "Burning" crypto assets is a process that permanently

12

decreases the total supply of a crypto asset and thereby typically increases the value of that crypto asset.

49. Of the remaining 75 billion GME tokens, Zhu transferred 20 billion to addresses controlled by Individual 1, Individual 2, and Individual 3, and to an address that Individual 1 and Individual 2 designated to be used for GME marketing purposes. The purpose of these transfers, respectively, was to ensure that Individuals 1, 2 and 3 would profit if the value of GME increased and to fund GME marketing expenses.

50. Zhu deposited the remaining 55 billion GME tokens into the GME Liquidity Pool. Zhu also deposited into the Pool 100 BNB provided by Individual 1, which was at the time worth the equivalent of approximately $28,196. Together, the 55 billion GME tokens and the 100 BNB constituted the initial liquidity for the GME Liquidity Pool.

51. Because he deposited the GME and BNB into the GME Liquidity Pool, Zhu received LP tokens corresponding to these deposits of initial liquidity. Zhu transferred the LP tokens from his address to an address controlled by Individual 3 and instructed Individual 3 on how to "lock" those LP tokens. The process of "locking" these LP tokens prevented anyone from using them to withdraw GME and BNB from the GME Liquidity Pool.

### D. The GME Smart Contract and Zhu's Set of Unlocked LP Tokens

52. On or around June 22, 2021, GME was available for purchase and sale by any investor through the PancakeSwap GME Liquidity Pool.

53. Coincident with the inception of the sale of GME, Zhu deployed the newly-created GME smart contract. As alleged above, the smart contract incorporated a function that charged a 10% fee on each GME transaction. The smart contract function automatically deposited the proceeds from the fee into various addresses, including into an address designated

13

for charitable causes, an address designated for GME marketing, and into the GME Liquidity Pool. The automatic deposits of liquidity into the GME Liquidity Pool created a continuously increasing set of *unlocked* LP tokens, which accrued in an address that was, at the time, under Zhu's exclusive control. Between June 2021 and September 16, 2021, that address accrued 8.16 unlocked LP tokens.

54. Zhu knew, or was reckless in not knowing, that GME investors expected the creators of GME to take steps to safeguard these LP tokens and prevent them from being used in a rug pull. He also knew, or was reckless in not knowing, that investors were told that liquidity was locked. However, Zhu kept his set of 8.16 LP tokens unlocked.

55. By controlling these unlocked LP tokens, Zhu had the ability to withdraw liquidity at will from the GME Liquidity Pool, then diminish the value of GME by selling the withdrawn GME for his own benefit, thereby destroying investor confidence in GME (i.e., engage in a rug pull).

### E. Zhu Siphons Investor Funds from the Liquidity Pool

56. In or around August 2021, Individual 1 and Individual 2 hired a third party to assist with technological support for the offer and sale of GME. The third party identified vulnerabilities arising from certain LP tokens being concentrated in a single address that Individual 1 and Individual 2 did not control.

57. By September 16, 2021, concerned in part about these vulnerabilities, Individual 1 and Individual 2 sought to obtain the private key to this address, which was at that time, under Zhu's exclusive control. As alleged above, this address contained 8.16 unlocked LP tokens that could be used to withdraw GME and BNB from the GME Liquidity Pool.

58. On September 17, 2021, Zhu agreed to share with Individual 1 and Individual 2 the private key to the address under his control. However, before sharing the private key, Zhu transferred the 8.16 unlocked LP tokens to a *separate* address also under his control.

59. On September 17, 2021 and September 18, 2021, in a series of transactions through PancakeSwap, Zhu used the unlocked LP tokens to withdraw GME and BNB from the GME Liquidity Pool. On the same day, Zhu sold (i.e., deposited) the GME back into the GME Liquidity Pool and bought (i.e., withdrew) BNB. At the time of those sales, GME was trading in the range of approximately $.0039 to $.0045, which represented a premium of at least 24,000% over the value of GME on August 14, 2021, and a premium of at least 78,000% over the value of GME on June 23, 2021.

60. Zhu's sales of GME caused an approximate 12% decline in the price of GME, and caused panic and suspicion among GME investors on social media that GME had been the target of a rug pull which, in fact, it had.

61. On September 18, 2021, Zhu transferred some of the BNB he withdrew and the proceeds of his sales of GME to an address that he controlled and that was hosted by an offshore crypto asset trading platform. Together, at the time, they were worth approximately $553,000.

62. Individual 1 and Individual 2 rightfully suspected that the GME Liquidity Pool had been the target of a rug pull. Individual 1 and Individual 2 eventually stopped promoting GME and instead decided to use a different crypto asset as the medium of exchange for the promised digital trading card marketplace. The marketplace was eventually launched in November 2024.

## VII.
## CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 17(a)(1) of the Securities Act

63. The Commission repeats and realleges Paragraphs 1 through 62 of this Complaint as if incorporated herein.

64. From approximately June 2021 through at least September 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly, directly or indirectly employed devices, schemes, or artifices to defraud.

65. By reason of the foregoing, Defendant violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT II

### Violations of Section 17(a)(3) of the Securities Act

66. The Commission repeats and realleges Paragraphs 1 through 62 of this Complaint as if incorporated herein.

67. From approximately June 2021 through at least September 2021, Defendant, in the offer or sale of securities by use any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers of such securities.

68. By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

16

## COUNT III

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

69. The Commission repeats and realleges Paragraphs 1 through 62 of its Complaint as if incorporated herein.

70. From approximately June 2021 through at least September 2021, Defendant, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of a security.

71. By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) thereunder of the Exchange Act [17 C.F.R. § 240.10b-5(a)].

## COUNT IV

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

72. The Commission repeats and realleges Paragraphs 1 through 62 of its Complaint as if incorporated herein.

73. From approximately June 2021 through at least September 2021, the Defendant, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of a security.

74. By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(c) thereunder of the Exchange Act [17 C.F.R. § 240.10b-5(c)].

# VIII.
# RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendant committed the violations alleged, and:

## I.
## Permanent Injunction

Issue a Permanent Injunction enjoining Defendant, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], and Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## II.
## Disgorgement

Issue an Order directing Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.
## Penalties

Issue an Order directing Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.
## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## V.
## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendant in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.
## Demand for Jury Trial

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  January 16, 2025    Respectfully submitted

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

/s/ Davis Rhorer, Jr.
Davis Rhorer, Jr., LBN 37519
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Facsimile:  (225) 389-0685
E-mail: davis.rhorer@usdoj.gov

/s/ Russell Koonin
Russell Koonin
Senior Trial Counsel
Fla. Bar No. 474479
Direct Dial: (305) 982-6390
Email: kooninr@sec.gov

/s/ Alexander H. Charap
Senior Counsel
Fla. Bar No. 1035908
Direct Dial: (305) 416-6228
Email: charapal@sec.gov

                                  <u>/s/Sarah B. Belter-Pylant</u>
Counsel
Fla Bar No. 27485
Direct Dial: (305) 416-6246
Email: belterpylants@sec.gov

Attorneys for Plaintiff
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154