UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CASE NO.: 3:25-cv-00054-JWD-RLB

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

ERIC ZHU,

    Defendant.

_____/

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S UNOPPOSED MOTION FOR ENTRY OF FINAL JUDGMENT AGAINST DEFENDANT ERIC ZHU

### I. Introduction

Plaintiff Securities and Exchange Commission ("Commission") moves for entry of the proposed Final Judgment against Defendant Eric Zhu ("Defendant" or "Zhu") (Exhibit A). For the reasons set forth below, the Court should enter the proposed Final Judgment to which the Defendant has consented (Exhibit B).

### II. Procedural History and Factual Background

On January 16, 2025, the Commission filed its Complaint against Defendant. As alleged in the Complaint, from approximately June 2021 through at least September 2021, Defendant Eric Zhu engaged in a fraudulent scheme to deceive investors in the "Game Coin" token ("GME"), a crypto asset that was offered and sold as a security, predominantly to investors residing in or around Baton Rouge, Louisiana. (Complaint, DE 1, ¶1).

Individual 1 and Individual 2, who are both in the landscaping business by trade, formed a business to develop a website-based "Game Coin" marketplace that would allow amateur athletes to create and sell digital trading cards of themselves. Individual 1 and Individual 2 contemplated the creation of a new crypto asset called "GME" that would serve as the medium of exchange for purchases of digital trading cards available for sale on the marketplace. Individual 1 and Individual 2 aggressively promoted GME on social media and promised investors that they would build a marketplace where investors could use GME to buy digital trading cards of amateur athletes. Zhu, an experienced blockchain engineer, was hired to perform coding work for the offer and sale of GME to the public. (*Id.,* ¶2).

From at least June 2021 through at least November 2021, Individual 1 and Individual 2 offered and sold GME to investors through a crypto asset trading platform known as PancakeSwap. PancakeSwap enables investors to trade crypto assets. PancakeSwap does so by facilitating the creation and operation of so-called "liquidity pools," which are pools of crypto asset pairs that may be exchanged for one another. For example, a liquidity pool may hold Crypto Asset A and Crypto Asset B, and an investor may withdraw Crypto Asset A from the pool in exchange for depositing Crypto Asset B into the pool. (*Id.,* ¶3).

In June 2021, Individual 1 and Individual 2 launched the public sale of GME by establishing a PancakeSwap liquidity pool (the "GME Liquidity Pool" or the "Pool"). The GME Liquidity Pool enables any investor to buy and sell GME. As the name suggests, liquidity pools require liquidity (i.e., deposited crypto asset pairs available for trading). Individual 1 and Individual 2 arranged for GME and the crypto asset known as Binance Coin "BNB" to be deposited into the GME Liquidity Pool. These deposits of GME and BNB served as the initial liquidity for the GME Liquidity Pool. (*Id.,* ¶4).

Investors are able to interact with the GME Liquidity Pool – for example, buying GME and depositing BNB, or selling GME and withdrawing BNB. At any given time, the value of GME in the GME Liquidity Pool is determined by the ratio of GME and BNB in the Pool. As investors purchased GME through the GME Liquidity Pool using BNB, the supply of GME within the Pool decreases and the value of GME increases. (*Id.*, ¶5).

A person that deposits a crypto asset token pair (i.e., liquidity) into the Liquidity Pool receives "liquidity provider" tokens ("LP tokens"). Absent safeguards, these LP tokens allow the holder of the tokens to withdraw a pro rata share of the liquidity deposited into the Pool. Such liquidity pools create certain risks for investors, including the risk that the holder of a significant number of LP tokens will, without warning, withdraw a large portion of the token pair (here, GME and BNB) from the liquidity pool. The LP token holder may then sell (i.e., deposit) large volumes of one of the crypto assets into the Pool, thus significantly diminishing the value of that crypto asset. A significant withdrawal of liquidity, and corresponding sale of a crypto asset, is described by some in the crypto asset industry as a "rug pull" because the seller, in essence, pulls the rug out from under the investors who purchased crypto assets through the liquidity pool. (*Id.*, ¶6).

Cognizant of this risk, Individual 1 and Individual 2 represented in publicly-available social media posts that they implemented safeguards. In particular, they assured investors that "liquidity" was "locked," which in the parlance of the crypto asset industry, conveys that LP tokens cannot be used by the issuers or other insiders to withdraw liquidity in rug pull-like fashion. (*Id.*, ¶7).

Zhu engaged in a course of conduct that deceived GME investors about the vulnerability of the GME offering to rug pulls and about the value of GME. Zhu knew, or was reckless in not

3

knowing, that investors were told that liquidity was locked. Zhu also knew, or was reckless in not knowing, that GME investors expected the creators of GME to take steps to safeguard LP tokens and prevent them from being used in a rug pull. (*Id.*, ¶8).

Yet, as part of the mechanics of the offer and sale of GME, certain LP tokens accrued to an address Zhu alone controlled. And, unbeknownst to anyone, including Individual 1 and Individual 2, Zhu kept those LP tokens *unlocked* and used them to withdraw GME and BNB from the Liquidity Pool. Zhu then sold the withdrawn GME into the Liquidity Pool and misappropriated crypto assets worth approximately $553,000. Zhu's sales were indicative of a possible rug pull and caused an approximate 12% decline in the price of GME. (*Id.*, ¶9).

As a result, the Complaint alleges the Defendant violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder, as well as Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act").

The Commission's action seeks permanent injunctive relief against Defendant as to the violations charged, and disgorgement with prejudgment interest thereon, and a civil penalty against Defendant. By his Consent, Defendant agrees to the entry of the proposed Final Judgment attached as Exhibit A which will resolve the entirety of the Commission's claims for relief against the Defendant, to include permanent injunctive relief, disgorgement with prejudgment interest, and a civil penalty.

### III. Memorandum of Law

#### A. Permanent Injunctive Relief

The proposed Final Judgment complies with Federal Rule of Civil Procedure 65(d), which provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the

complaint or other document—the act or acts sought to be restrained or required." *See* Fed. R. Civ. P. 65(d). "This command of specificity is a reflection of the seriousness of the consequences which may flow from the violation of an injunctive order." *Payne v. Travenol Labs., Inc.,* 565 F.2d 895, 897 (5th Cir. 1978).

The proposed Final Judgment conforms with Fifth Circuit law, which, consistent with Rule 65(d), requires that judgments for injunctive relief have the requisite specificity and are not "obey the law" injunctions. *See e.g., Diageo North Am. Inc. v. Mexcor Inc.,* 661 Fed. Appx. 806, 814 (5th Cir. 2016); *Randolph v. East Baton Rouge Parish School Bd.,* No. 15-654-SDD-EWD, 2016 WL 3579224, at *3 (M.D. La. June 28, 2016); *see also SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012).

In *Goble,* the Court questioned whether an injunction that merely repeats the language of Section 10(b) and Rule 10b-5 of the Exchange Act would survive judicial scrutiny. *Id.* at 951. The court expressed concern that given the wide range of conduct covered by Section 10(b) and Rule 10b-5 of the Exchange Act, and the large amount of case law interpreting those provisions, simply reciting the language of the statute and rule in an injunction fails to provide the detail needed to "inform the defendant of precisely what conduct is forbidden." *Id*.

*Goble* acknowledged that an obey the law injunction based on a statutory provision that states specifically what is required to comply with it could satisfy Fed. R. Civ. P. 65(d)(1). Applying this principle, the Court indicated that an injunction against violations of Exchange Act Sections 15(c)(3) and 17(a) and Exchange Act Rules 15c3-3 and 17a-3 may be permissible because the rules "specifically describe the acts required of the person enjoined." *Id.* at 952. Thus, under *Goble*, "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the

5

defendant know what he is ordered to do or not." *Id.* at 952. "The test the test for whether an injunction is vague is whether "those enjoined will know what conduct the court has prohibited." *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish,* No. 06-7185, 2009 WL 424584, at *3 (E.D. La. Feb. 19, 2009) (quoting *Meyer v. Brown & Root Const. Co.,* 661 F.2d 369, 373 (5th Cir. 1981).

Here, the Commission has filed a proposed Final Judgment that includes a permanent injunction that "largely uses" the language of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act, but that also specifically describes the enjoined conduct. Incorporated at the end of each subsection of the anti-fraud provisions alleged, the proposed Final Judgment includes the following descriptive language:

> [*language that tracks the statute*]. . . by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person; (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about any investment in securities, including securities offered or to be offered on a crypto asset trading platform; or (iii) misappropriating investor funds or proceeds.

Thus, in addition to tracking the requisite statutory language, the injunctive language includes specific prohibitions which are directly tied to the allegations in the Complaint and properly puts the Defendant on notice of the conduct which is prohibited. Thus, the proposed Final Judgment ordering injunctive relief against the Defendant is consistent with *Travenol Labs,* its progeny and *Goble.* Furthermore, given "[t]he fact that this was a negotiated decree consented to by the defendant[] makes the argument even less tenable that defendant[] [does] not know of its import." *Ennels v. Alabama Inns Ass'n,* 581 F. Supp. 708, 710 (M.D. Ala. 1984).

6

### B. Additional Relief

The proposed Final Judgment is also reflective of Defendant's consent in that it includes the imposition of disgorgement of $552,779, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $120,213, and a civil penalty in the amount of $150,000 pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, for a total of $822,992, to be paid to the Securities and Exchange Commission pursuant to the terms of the payment schedule set forth in the proposed Final Judgment.

### IV.

### Conferral

The undersigned have conferred with counsel for the Defendant who agrees on behalf of the Defendant to the entry of the proposed Final Judgment.

### V.

### Conclusion

WHEREFORE, the Commission respectfully requests that the Court enter the proposed Final Judgment to which the Defendant has consented.

Dated:  January 17, 2025

Respectfully submitted,

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

/s/ Davis Rhorer, Jr.
Davis Rhorer, Jr., LBN 37519
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: davis.rhorer@usdoj.gov

/s/ Russell Koonin
Russell Koonin
Senior Trial Counsel
Fla. Bar No. 474479
Direct Dial: (305) 982-6390
Email: kooninr@sec.gov

/s/ Alexander H. Charap
Senior Counsel
Fla. Bar No. 1035908
Direct Dial: (305) 416-6228
Email: charapal@sec.gov

/s/Sarah B. Belter-Pylant
Counsel
Fla Bar No. 27485
Direct Dial: (305) 416-6246
Email: belterpylants@sec.gov

Attorneys for Plaintiff
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed via CM/ECF on January 17, 2025 and also provided to Zhu's counsel via email at tmckay@maglaw.com and emaynard@maglaw.com.

/s/ Russell Koonin
Russell Koonin